IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| SADEED MUWAHID, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:25-cv-278–HEH |
| | ) |
| MARTIN MARIETTA MATERIALS, INC. | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**
(Resolving Motions for Summary Judgment)

THIS MATTER comes before the Court on a Motion for Summary Judgment ("the Motion," ECF No. 18) that Defendant Martin Marietta Materials, Inc. ("Defendant") filed on September 29, 2025, in response to Sadeeq Muwahid's ("Plaintiff") Complaint originally filed on April 10, 2025, in the Circuit Court of Chesterfield County ("Compl.," ECF No. 1-1, Ex. 1). The case was removed to this Court on the basis of Federal Question Jurisdiction. (ECF No. 1.) Defendant contemporaneously submitted its Brief in Support of the Motion for Summary Judgment. ("Brief in Support," ECF No. 19.) Plaintiff filed his response in opposition on October 14, 2025. ("Memorandum in Opposition," ECF No. 21.) Subsequently, Defendant filed its Reply on October 20, 2025. ("Reply," ECF No. 23.) The Court heard oral argument on November 10, 2025. For the reasons contained herein, the Court GRANTS IN PART Defendant's Motion with respect to the counts pleading constructive discharge and DENIES the Motion as to all other counts.

## I. BACKGROUND

### 1. Significant Individuals[1]

| Name | Job Position |
| --- | --- |
| Ivan Hughes | Welder, who usually worked the day shift (6:00AM to 4:30PM) |
| Willie Richardson | Outside contractor (not a Martin Marietta employee) and welder, who usually worked the day shift |
| Mike Stanley | Hourly leadman, who usually worked the night shift (approximately 4:00PM to 2:00AM) |
| Troy Keeney | Utility Person and plant operator, who usually worked the night shift |
| Sadeeq Muwahid | Welder and Plaintiff who usually worked the night shift. |
| Miller Gorny | Assistant Plant Supervisor |

### 2. Timeline of Key Events

| Date | Event |
| --- | --- |
| June/July 2021 | Plaintiff starts working at Defendant's Quarry |
| September 2021 | Alleged harassment begins |
| September 2021–June 2022 | Allegedly reported harassment to manager |
| March 30, 2022 | First *pro se* bankruptcy filing (*In re Muwahid*, bk-22-30822-KHK) |
| June 9, 2022 | Amended bankruptcy filing to fix unrelated error |

---

[1] Charts 1 and 2 are demonstrative aids and do not substitute for a recitation of the facts. Proper citations to the events detailed follow below.

2

| June 15, 2022 | Plaintiff report conduct to Human Resources (HR) and ethics hotline |
|---|---|
| June 18, 2022 | Plaintiff calls EEOC |
| June 20–24, 2022 | HR investigation |
| July 2, 2022 | Plaintiff files EEOC complaint |
| July 7; July 19, 2022 | Bankruptcy trustee discharged; bankruptcy case closed. |
| August 14, 2022 | Plaintiff resigns from Martin Marietta Materials |
| May 3, 2023 | Second EEOC Complaint |
| May 10, 2024 | Plaintiff Files Complaint in Virginia state court |
| April 10, 2025 | Defendant removed case to federal court |
| August 15, 2025 | Plaintiff motions to reopen bankruptcy |
| October 7, 2025 | Bankruptcy case closes |

Plaintiff began working as a welder for Defendant at their Midlothian, Virginia, quarry in approximately July of 2021. (Compl. ¶ 7.) Plaintiff alleges he suffered harassment over the course of his employment with Defendant; specifically, he alleges several coworkers consistently made unwelcome comments and insults about Plaintiff's race and religion, resulting in his constructive discharge. (*Id.* ¶¶ 9–11, Br. in Supp. ¶ 5, Mem. in Opp'n ¶¶ 11–15, 20, 22–24.) In particular, Plaintiff asserted six counts against Defendant, including: (1) wrongful termination in violation of 42 U.S.C. § 1981 ("Count I"); (2) racial harassment in violation of 42 U.S.C. § 1981 ("Count II"); (3) religious harassment in violation of 42 U.S.C. § 1981 ("Count III"); (4) wrongful termination in violation of 42 U.S.C. § 2000 ("Count IV"); (5) racial harassment in violation of 42 U.S.C. § 2000 ("Count V"); and (6) religious harassment in violation of 42 U.S.C. § 2000 ("Count VI"). (Compl. ¶¶ 20–37.)

As for the allegations of racial harassment, Plaintiff's former coworker Adam Johnson ("Johnson") testified in his declaration and deposition that other coworkers would use epithets as insults in place of Plaintiff's name on virtually every conversation in which they discussed Plaintiff. (Mem. in Opp'n ¶¶ 11–14.) Specifically, Johnson asserts that Plaintiff's coworkers, Ivan Hughes ("Hughes") and Troy Keeney ("Keeney"), and a sub-contractor, Willie Richardson ("Richardson"), commonly referred to Plaintiff using: (1) the "N-word" — almost entirely outside of Plaintiff's presence; (2) "boy" — often in his presence; and (3) "suck dick" — occasionally in Plaintiff's presence as a play on his name. (*Id.* ¶¶ 11, 23.) Additionally, a coworker told Plaintiff that Hughes stated that he "did not want to work around black people." (*Id.* ¶ 20.) Moreover, after a minor dispute between Plaintiff and Hughes, Plaintiff alleges that his boots were stolen from his locker and later found with the soles filled with a cement-like epoxy. (*Id.* ¶¶ 16, 24.) After Plaintiff complained to Michael Stanley ("Stanley") — a leadman for Defendant — Plaintiff found a note referring to him as a snitch and the "N-word." The note also stated that he should leave the company. (*Id.*) Plaintiff provides no pictures of the boots or note; however, Plaintiff asserts that he showed both to his cousin over Facetime. (*Id.* ¶ 25, Br. in Supp. ¶¶ 11–13.)

Additionally, Plaintiff alleges several instances of unwelcome comments regarding Plaintiff's religion. For example, Plaintiff alleges that Hughes stated in September 2021 that he hated Plaintiff's religion. (Mem. in Opp'n ¶ 20.) Additionally, Plaintiff contends that Hughes and Richardson referred to Plaintiff as a terrorist in the fall of 2021 and at a luncheon in the spring of 2022 commented that Ramadan is a "day for terrorists" and "dumb as fuck" because it is a day "for starving yourself for someone who does not exist." (*Id.* ¶¶ 20, 22.)

Moreover, Plaintiff alleges that Richardson stated Plaintiff's name sounded like that of a terrorist. (*Id.* ¶ 15.)

Plaintiff contends that he first informed Stanley of the harassment in September of 2021, and continued to do so throughout his employment, but Stanley failed to address the harassment. (*Id.* ¶¶ 1, 16, 18–20.) Plaintiff noted that, by early 2022, he believed that Stanley would not take any action to end the harassment. (*Id.* ¶ 21.) Key to this case, however, is that Plaintiff asserts that Stanley is a supervisor for the purposes of reporting harassment under Defendant's policies, since Stanley was the most senior employee during the night shift and he directed, oversaw, assigned, and evaluated Plaintiff's work. (*Id.* ¶¶ 1, 3, 7–8.)

On June 15, 2022—one (1) day after Plaintiff allegedly found his boots filled with cement—Plaintiff emailed Defendant's Human Resources Department to initiate a complaint. (Br. in Supp. ¶ 14.) Later that day, Plaintiff reported instances of the alleged discrimination through Defendant's 24-hour ethics hotline. (*Id.* ¶ 14, Mem. in Opp'n ¶ 24.) After the report, Defendant's Human Resources Manager Chris Kearnes ("Kearnes") began investigating the allegations on June 20, 2022. (Br. in Supp. ¶ 23.) By June 24, 2022, Kearnes completed the witness interviews, finding that the investigation substantiated Plaintiff's allegation that Richardson stated Plaintiff's name did not sound sufficiently "American," but failed to substantiate the other allegations. (*Id.* ¶¶ 24–25.) To remediate the situation, Defendant banned Richardson from the quarry and required all employees to attend refresher training on the anti-harassment policy. (*Id.* ¶ 26.) Plaintiff later filed charges with the EEOC alleging discrimination on July 2, 2022, and May 1, 2023. (Mem. in Opp'n ¶ 2.)

The day after Plaintiff complained to Human Resources, Plaintiff started paid leave because he allegedly sustained a workplace injury resulting in debilitating neck and back pain. (Br. in Supp. ¶ 17.) Plaintiff subsequently resigned after eight weeks of paid leave. (*Id.* ¶ 22.) Defendant asserts that while Plaintiff was on paid leave for his injury, he completed medical examinations required to start employment with another company. (*Id.* ¶¶ 28–32.) These medical examinations occurred while Defendant's Human Resources conducted its investigation into Plaintiff's allegations of workplace harassment and discrimination. (*Id.*) Plaintiff started working at another company, Newport News Shipbuilding, less than two weeks after starting paid medical leave. There he earned almost double his hourly rate compared to his compensation earned working for Defendant. (*Id.* ¶ 33.)

Plaintiff contends that Stanley was his supervisor under Defendant's harassment policy because: (1) Stanley was the highest-ranking employee on the company's premises from 5:00 PM to 2:30 AM during Plaintiff's shifts; (2) Defendant identified Stanley as a "supervisor" to the Department of Labor's Mine Safety and Health Administration on inspection documents and as the "Surface Mining Foreman," who is required to be onsite during mining operations, to the Commonwealth of Virginia; and (3) Stanley's job description includes some supervisory functions. (Mem. in Opp'n at ¶¶ 5–10.) Plaintiff also contends that neither Defendant nor Stanley took any steps to inform the employees under Stanley that he was not their supervisor within the meaning of Defendant's harassment policy. (*Id.* at 23.) Because Stanley failed to remedy the harassment promptly or report the information to Human Resources, Plaintiff contends he has established the fourth element— he provided a proper basis to impose liability on Defendant. (*Id.* at 22.)

6

Separately, Plaintiff filed for Chapter 7 Bankruptcy *pro se* in the Eastern District of Virginia in March 2022. (*Id.* ¶ 36, Mem. in Opp'n ¶ 26.) However, Plaintiff submitted his amended schedule on June 9, 2022, after the bankruptcy trustee noted mistakes and errors in his calculation. (Mem. in Opp'n ¶ 28.) In both his original and amended bankruptcy filings, Plaintiff checked a box on the schedule indicating that he had no "[c]laims against third parties, whether or not [he had] filed a lawsuit or made a demand for payment." (*Id.* ¶ 28, Br. in Supp. ¶ 39–40.) Notably, this question provided examples such as "employment disputes, insurance, claims, or rights to sue." (Br. in Supp. ¶¶ 39–40.) However, on June 18, 2022, nine (9) days after filing the amended schedule and while the bankruptcy case was still pending, Plaintiff contacted the EEOC. (*Id.* ¶ 41.) The bankruptcy case was then closed on July 9, 2022. Plaintiff filed to reopen the bankruptcy case in August 2025, and on September 10, 2025 the court reopened the case and ordered Plaintiff to file an amended schedule. (Mem. in Opp'n ¶ 29.) The bankruptcy case closed again on October 7, 2025. (*Id.* at 19.) Plaintiff asserts that his failure to disclose the EEOC charge and potential claims against Defendant was inadvertent. (*Id.*)

Following discovery, Defendant filed its Motion for Summary Judgment for all counts. First, Defendant contends that there is no question of material fact when focusing on Plaintiff's racial harassment claims (Counts II and V) and religious harassment claims (Counts III and VI), because once Defendant was put on notice of the alleged harassment, it took prompt remedial action. (Br. in Supp. at 13–16.) Additionally, focusing solely on Plaintiff's religious harassment claims (Counts III and VI), Defendant asserts that Plaintiff fails to provide enough instances of relevant conduct to establish that the alleged harassment was sufficiently severe or pervasive to alter the conditions of employment and create an

7

abusive atmosphere. (*Id.* at 16–17.) Next, Defendant contends that the Court should grant summary judgment on Plaintiff's claims of wrongful termination (Count I and IV) because (1) the employment conditions were not so intolerable that a reasonable person would be compelled to resign; and (2) Plaintiff did not actually resign because of the intolerable conditions. (*Id.* at 18–19.) Lastly, Defendant asserts that judicial estoppel precludes Plaintiff from bringing claims against Defendant, as Plaintiff failed to disclose the potential claims when filing for bankruptcy. (*Id.* at 12–13.)

## II. LEGAL STANDARD

### A. Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of a party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). A genuine issue concerning a material fact arises when the evidence is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly raised and supported, the opposing party bears the burden of showing that a genuine dispute of material fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to

particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50).

A district court may consider specific allegations in a party's pleadings if the party shows that he or she is competent to testify on the matters stated, verifies that those allegations are based on the party's personal knowledge, and shows that the allegations set out facts that would be admissible in evidence. *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *3 (E.D. Va. June 1, 2011) (citing Fed. R. Civ. P. 56(c)(4)), *aff'd*, 469 F. App'x 160 (4th Cir. 2012). Furthermore, if one party fails to properly address another party's assertion of fact, the court may consider that fact undisputed for purposes of a summary judgment motion. Fed. R. Civ. P. 56(e). At the summary judgment stage, the Court views the facts presented by the evidence, and reasonable inferences therefrom, in the light most favorable to the nonmoving party. *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (citing *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018)).

### B. Title VII

"A hostile environment that violates Title VII 'exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult'" to an extent that is "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015)). To prevail at trial on a hostile work environment claim, the employee must

establish that (1) he experienced unwelcome harassment; (2) the harassment was based on his race or protected activity; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Id.* (quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d at 765 (4th Cir. 2003)); *Mais v. Albemarle Cnty. Sch. Bd.*, 657 F. Supp. 3d 813, 828 (W.D. Va. 2023). The first two elements are uncontested here. Thus, the Court will address each of the third and fourth elements separately.

### III. ANALYSIS

#### A. Hostile Workplace Environment, Racial and Religious Harassment (Counts II, III, V, VI)

##### i. Imputing Liability to the Employer for Harassment

The Court begins with the fourth element of employer liability, which plays a prominent role in the pleadings of both parties. Defendant contends that Plaintiff's claims for racial and religious harassment fail because Plaintiff does not satisfy the fourth element required to prevail: establishing that there is a basis for imposing liability on Defendant. (Br. in Supp. at 13–14.) An employer is liable for coworker harassment only "if it knew or should have known about the harassment and failed to take effective action to stop it." *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006). Additionally, an employer "may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." Employers, therefore, cannot prevail on a "hear no evil, see no evil strategy" when they should know of the harassment at issue. *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 334 (4th Cir. 2003). Nonetheless, "an employer *cannot* be expected to correct harassment" if it has established "reasonable procedures" which require that "the employee makes a concerted effort to inform the

10

employer that a problem exists." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 674 (4th Cir. 2011) (quoting *Howard*, 446 F.3d at 567).

Defendant maintains an anti-harassment policy which states in part: "[a]n employee who believes that he/she has been harassed, discriminated against, or retaliated against should promptly report the facts of the incident(s) to his or her supervisor and/or to the human resources department." (Br. in Supp. at 23.) Defendant states that Plaintiff failed to provide adequate notice of the alleged conduct until he contacted Defendant's 24-hour ethics hotline, contact which Plaintiff only initiated on his last day working on site. (*Id.* at 14.) Defendant admits that Plaintiff discussed instances of the alleged harassment with Stanley, but that Stanley was merely a leadman and an hourly employee, rather than a supervisor under Defendant's harassment policy. (*Id.* at 15.)

Plaintiff bases this conclusion in part on Stanley's responses to his complaints of harassment: when Plaintiff informed Stanley of the alleged harassment, Stanley dismissed the complaints with responses such as "don't worry about it" and "turn the other cheek." (*Id.*) Defendant contends, therefore, that Plaintiff was aware that his complaints would not be passed along to a supervisor responsible for personnel harassment issues. (*Id.*)

Defendant contends that Plaintiff's proper supervisor within the meaning of Title VII was the plant manager, not Stanley. (*Id.*) Furthermore, according to Defendant, Plaintiff failed to report any of the alleged instances of harassment to the plant manager despite having daily access to him in person and by phone. (*Id.*) Defendant contends that once Plaintiff contacted Human Resources, it investigated the allegations in accordance with its policies and procedures, remedying the harassment soon after. (*Id.* at 14.)

11

Defendant relies heavily upon *Clehm v. BAE Systems Ordnance Systems, Inc.* where the Western District of Virginia granted summary judgment, and the Fourth Circuit affirmed, in favor of an employer. 291 F. Supp. 3d 775, 789–90 (W.D. Va. 2017), aff'd 786 F. App'x 391 (4th Cir. 2019)). Both parties discussed *Clehm* at length during the summary judgment hearing on November 10, 2025, and the Court agrees with the parties that *Clehm* is instructive in the present case. In *Clehm*, the employee reported an incident of alleged harassment to a superior whom she considered her supervisor; the court found that her superior was merely an "hourly employee" and not an actual supervisor under Title VII. (Br. in Supp. at 15–16) (citing *Clehm*, 291 F. Supp. 3d at 787–90). The *Clehm* Court drew this conclusion from the fact that the superior directly told the plaintiff-employee that they would not escalate reports of the employee's complaints to supervisors. *Clehm*, 291 F. Supp. 3d at 788. Additionally, our sister court also recently found that an employer was liable for harassment carried out by employees when a school teacher reported her harassment allegations to her principal, the assistant superintendent, and human resources. *Mais*, 657 F. Supp. 3d at 829 (W.D. Va. 2023).

The present case treads well within the lines of these past cases. Like the superior in *Clehm*, Stanley's actions likely indicated to Plaintiff that Stanley did not intend to inform other supervisors of the alleged harassment. (Br. in Supp. at 15) (citing *Clehm*, 291 F. Supp. 3d at 788). Thus, Plaintiff likely failed to comply with Defendant's harassment reporting procedures, and accordingly, fails to show that Defendant is liable. (Br. in Supp. at 15–16) (citing *Clehm*, 291 F. Supp. 3d at 788–89).

However, despite the strength of this evidence in Defendant's favor, "[s]ummary judgment cannot be granted merely because the court believes that the movant will prevail if

the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015). Plaintiff has presented evidence of Stanley's supervisory capacities which establish a material issue of fact. (Mem. in Opp'n ¶¶ 5–10; 22–23.) Given the permissive standard required at summary judgment, we cannot conclude that there is but a mere "scintilla of evidence" to support Plaintiff's claims. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). On the record available at this time, a reasonable jury could possibly conclude that Plaintiff's actions in reporting the incidents to Stanley may impute liability to Defendant.

### ii. Severity or Pervasiveness of Harassment

Defendant also contends that Plaintiff fails to provide evidence establishing the third element for the alleged religious harassment—that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. (Br. in Supp. at 16.) "The severe or pervasive element of a hostile work environment claim has both subjective and objective components." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). "'Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position.'" *Holloway*, 32 F.4th at 300 (quoting *Boyer-Liberto*, 786 F.3d at 277). To make this determination, the Court must take a holistic approach, looking to "all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating" in order to determine if these circumstances "unreasonably interfere[] with an employee's work performance." *Id.* at 300–01. A "mere offensive utterance" does not meet this standard. *Id.* Indeed, numerous courts have held that "rude treatment," "callous behavior," "routine difference of opinion and personality conflict," and/or "simple teasing," do not suffice to

13

establish the third element, even where these kinds of behaviors occur repeatedly. *Sunbelt Rentals*, 521 F.3d at 315–316; *Mais*, 657 F. Supp. 3d at 828; *see also Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422 (4th Cir. 2014).

Plaintiff in his reply appears to conjoin the severity and pervasive analysis for both the racial and the religious harassment, when Defendant only asserted the lack of severity and pervasiveness for the religious harassment claim. (Mem. in Opp'n at 24–25.) While Plaintiff provides only sporadic evidence indicating the occurrence of religious harassment (on roughly five occasions over the course of a year), Plaintiff still alleges a greater number of instances of racial harassment. (*Id.* at 25; Br. in Supp. at 16–17.) Given the holistic character of this inquiry, while the Court views it as unlikely that the limited and sporadic instances of alleged conduct are sufficiently severe and pervasive, a reasonable jury could conclude otherwise. In turn, the Court concludes the Plaintiff has met his burden with respect to the third element at this stage.

### C. Plaintiff's Constructive Discharge Claim (Counts I and IV)

For Plaintiff to prevail on a claim for constructive discharge, he must establish two elements: (1) his "'working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign'"; and (2) he actually resigned because of those conditions. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211–12 (4th Cir. 2019) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). Constructive discharge requires proof of "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Perkins*, 936 F.3d at 212.

Courts assess intolerability utilizing an "objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign . . . that is, whether

14

he would have had *no choice* but to resign." *Id.* at 212. Thus, "'[i]ntolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign.'" *Id.* (quoting *Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996).

Defendant asserts that the working conditions were not so intolerable that a reasonable person in the employee's position would have felt compelled to resign, because the unwelcome conduct ceased after Plaintiff put the organization on notice of the alleged harassment. (Br. in Supp. at 19.) Furthermore, Defendant contends that nothing prevented Plaintiff from returning to work after his medical leave. (*Id.*) Additionally, Defendant contends that Plaintiff did not resign because of the alleged harassment, but instead because Plaintiff started a new job while still on medical leave with Defendant.[2] (*Id.*)

While this Court concluded that a reasonable trier or fact could find that a hostile work environment existed in this case, a constructive discharge claim requires "'something more' than the showing required for a hostile work environment claim." *Mais*, 657 F. Supp. 3d at 829. To succeed, Plaintiff must have "had *no choice* but to resign." *Id.* (quoting *Evans*, 936 F.3d at 193). Here, Plaintiff elected to continue working for Defendant well after the alleged harassment began, and ultimately quit after Defendant took concrete steps to redress the harassment. (Br. in Supp. ¶ 17.) Plaintiff did not return to work even after

---

[2] Defendant provides evidence that in Plaintiff's deposition, Plaintiff falsely testified he was out of work for three months after resigning from Martin Marietta in August 2022. (Br. in Supp. at 8, n.2). Defendant provided evidence that this statement was false, because Plaintiff started a new job on June 27, 2022. (Br. in Supp., Ex. 20 at 12.) Defendant further alleges Plaintiff was previously convicted of felony perjury. (Br. in Supp. ¶ 38.) Plaintiff does not dispute either of Defendant's allegations.

15

Defendant took these remedial steps, which included banning an outside contractor who made offensive comments. (*Id.* at 14.) In a recent case where a constructive discharge claim was allowed to proceed, the employer was clearly on notice and failed to redress repeated and ongoing allegations of harassment. *Mais*, 657 F. Supp. 3d at 828. Additionally, the circumstances of Platiniff's disability leave, during which he took another position and did not return to work after reporting the harassment to HR, alongside the inconsistencies in his bankruptcy pleading, make it difficult to accept the contention that Plaintiff had no choice but to resign his position during the course of the alleged harassment. (Br. in Supp. ¶¶ 17–27.) Thus, even viewed under the more the permissive standard of summary judgment, the Court finds insufficient evidence to support Plaintiff's claim of constructive discharge, and accordingly will grant Defendant's Motion to Dismiss as to Counts I and IV.

### D. Judicial Estoppel

Judicial estoppel "is an equitable doctrine, designed to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). Judicial estoppel is typically implemented when a party "has taken a later position that is 'clearly inconsistent' with [their] earlier one; has persuaded a court to adopt the earlier position, creating a perception that 'either the first or the second court was misled'; and would 'derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Id.* (quoting *New Hampshire*, 532 U.S. at 750–51). However, judicial estoppel applies only when "'the party who is alleged to be estopped *intentionally* misled the court to gain unfair advantage,' and not when 'a party's prior position was based on inadvertence or mistake.'" *Id.* (quoting *John*

*S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995)). Therefore, "'[w]ithout bad faith, there can be no judicial estoppel.'" *Id.* at 394 (quoting *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007)).

Both Plaintiff and Defendant acknowledge that judicial estoppel involves bad faith—a party intentionally misleading the court to gain an unfair advantage—not inadvertence or mistake. (Br. in Supp. at 12; Mem. in Opp'n at 15.) However, Defendant contends that Plaintiff acted in bad faith and intentionally misled the bankruptcy court when he failed to indicate he had any employment claims or disputes when he filed *pro se* for bankruptcy in March 2022 and amended his schedule on June 8, 2022. (Br. in Supp. at 12–13.) Defendant further alleges that Plaintiff contacting the EEOC on June 18, 2022 and filing an EEOC complaint on July 2, 2022 while his bankruptcy case was still pending establishes Plaintiff's bad faith. (*Id.* at 12–13.)

Plaintiff contends he lacked an understanding of the bankruptcy process and did not intentionally deceive the bankruptcy court, because he filed his bankruptcy case *pro se* and did not understand he had to disclose the potential EEOC charge. (Mem. in Opp'n, Ex. 18.) Further, when Plaintiff learned of his need to disclose the EEOC charge, Plaintiff motioned the bankruptcy court to reopen his bankruptcy case, and the court ordered him to submit his amended schedule. (*Id.* at 18–19.) Following Plaintiff's submission of the amended schedule disclosing all his potential claims, including the matters here, the bankruptcy court closed the matter and discharged the trustee. (*Id.* at 19.)

Like the plaintiff in *Martineau*, when Plaintiff learned of this mistake, he promptly moved the bankruptcy court to reopen his bankruptcy case and amend his schedule. *See* 934 F.3d at 395–96. An inquiry into allegations of "bad faith" is flexible and fact-intensive; on

17

the record at hand, the Court does not have sufficient evidence to dismiss this defense on a motion for summary judgment, nor end the case in favor of Defendant. *See id.* at 395. In turn, the Court will deny Defendant's motion for summary judgment on the basis of judicial estoppel.

### E. Real Party in Interest

Defendant in its reply contends that the real party in interest doctrine bars Plaintiff, as the debtor in the bankruptcy case, from asserting any claims that belong to his estate. (Reply at 3–4.) Because Plaintiff has now amended his bankruptcy schedule to include these claims, Defendant contends that Plaintiff does not have standing to pursue these claims as Plaintiff no longer is the real party in interest. (*Id.*)[3] Thus, the question before the Court is whether Plaintiff is legally entitled to pursue these claims on his own behalf, or whether the claims belong solely to his bankruptcy estate. *Martineau*, 934 F.3d at 391. "In the context of a Chapter 7 bankruptcy, it is the bankruptcy trustee and not the debtor who is the real party in interest with respect to property of the estate, with the right to bring any legal claims that belong to the estate." *Id.* (citing *Wilson*, 717 F.3d at 343.) However, when a bankruptcy trustee abandons the legal claims, then the claims are "brought outside of the bankruptcy estate, and in turn, the Plaintiff is the real party in interest. *Id.*

The Court will deny Defendant's Motion for Summary Judgment on these grounds, given the lack of clarity as to whether the bankruptcy trustee for Plaintiff's

---

[3] While Defendant did raise the issue of real party in interest in its Brief in Support, Defendant did not elaborate beyond a single sentence and did not provide support for their assertion. (Br. in Supp. at 20.) Therefore, Plaintiff did not brief the issue in their Memorandum in Opposition or at oral arguments.

18

bankruptcy estate has abandoned its interest in Plaintiff's claims. Notably, the status of Plaintiff's bankruptcy case is unclear from the parties' briefings because Plaintiff has only stated "[t]he bankruptcy court closed Muwahid's case on October 7, discharged the trustee, and made no statements or findings that he had filed his schedules in bad faith," while failing to provide further exhibits. (Mem. in Opp'n ¶ 29.) However, "[u]nless the court orders otherwise, any property scheduled under section 521(a)(1) of this title [11 U.S.C. § 521(a)(1)] not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title [11 U.S.C. § 350]." 11 U.S.C. § 554(c). Therefore, the Court requests the parties thoroughly brief this real party in interest issue at least thirty (30) days in advance of trial.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 18) will be granted in part with respect to Counts I and IV and denied with respect to all other counts.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: Dec. 3, 2025
Richmond, Virginia

19